## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| David Precht, Individually and on Behalf of All Others Similarly Situated,<br><br>     Plaintiff,<br><br>   v.<br><br>REALPAGE, INC.; GREYSTAR REAL ESTATE PARTNERS, LLC; CUSHMAN & WAKEFIELD, INC.: LINCOLN PROPERTY COMPANY; PEABODY PROPERTIES, INC.; WINNCOMPANIES LLC AND WINNRESIDENTIAL MANAGER CORP.; UDR, INC.; SHP MANAGEMENT CORP.; THE RELATED COMPANIES, INC.; and SIMPSON PROPERTY GROUP, LLLP<br><br>     Defendants. | Case No. 1:22-cv-12230<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff David Precht, individually and on behalf of all others similarly situated (the "Class," as defined below), upon personal knowledge as to the facts pertaining to himself and upon information and belief as to all other matters, and based on the investigation of counsel, brings this class action complaint to recover treble damages, injunctive relief, and other relief as appropriate, based on Defendants RealPage, Inc., Greystar Real Estate Partners, LLC, Cushman & Wakefield, Inc., Lincoln Property Company, Peabody Properties, Inc., WinnCompanies LLC and

WinnResidential Manager Corp., UDR, Inc., SHP Management Corp., The Related Companies, Inc., and Simpson Property Group, LLLP's violation of federal and state antitrust laws.

## I.    NATURE OF THE ACTION

1.      This action arises from Defendants' conspiracy to fix, raise, maintain, and stabilize rental housing prices in the Greater Boston Metro Area.[1]

2.      Defendants are RealPage, Inc. ("RealPage"), the developer of a software platform called "AI Revenue Management" (previously known as "YieldStar"), and several managers of large-scale residential apartment buildings that used RealPage's software platform to coordinate and agree upon rental housing pricing, among other things, in the Greater Boston Metro Area.

3.      AI Revenue Management works by collecting vast amounts of non-public data from its client property managers regarding lease transactions, rent prices, occupancy levels, and virtually every other possible data point that drives rent.  This data is fed into an algorithm, along with additional data collected from Defendant RealPage's myriad other data analytics and rental management software products.  RealPage's algorithm uses that data to generate a rental price for each of RealPage's client's available units, which is updated daily.  RealPage makes sure all of its clients know that to maximize revenues, they must accept the software's rental price at least 80%-90% of the time, and RealPage's "Revenue Management Advisors" monitor clients' compliance with that recommendation.  As the allegations and evidence set forth below demonstrate, RealPage and the property managers who use its revenue management services constitute a price-fixing cartel, and the revenue growth they have achieved is possible only through coordinated price setting.

---

[1]      As used throughout this Complaint, the Greater Boston Metro Area consists of the area in Massachusetts bounded by the Atlantic Ocean to the east, the New Hampshire border to the north, and Interstate 495 to the west and south.  References to Boston throughout this Complaint, unless specifically limited, refer to the Greater Boston Metro Area.

4.      With the assurance that their competitors are setting Boston rental prices using the same algorithm, each Defendant property manager could allow a larger share of their units to remain vacant while maintaining higher rental prices across their properties.  This increased their revenue at the expense of renters.

5.      Defendants' strategy only succeeded because of the pricing coordination among competing property managers enabled by this cartel.  Knowing this, Defendant RealPage repeatedly and explicitly emphasizes that for the software to work properly, everyone needs to accept its suggested price at least 80%-90% of the time.  As one property manager using RealPage put it: "*[W]e are all technically competitors* . . . *[but RealPage] helps us work together* . . . to work with a community in pricing strategies, not to work separately."

6.      Before the introduction of coordinated rent-setting software, residential property managers generally set prices independently, to maximize occupancy.  Allowing apartments to stand vacant in Boston at their advertised rental prices made little sense when similar apartments in the area were available for less.  Thus, in the past, Boston property managers had an incentive to lower rents until all available units were occupied.  Allowing apartments to sit unoccupied, would not be a profitable strategy unless there was some assurance or expectation that other Boston property managers would similarly allow their units to remain vacant without lowering rents. Defendant RealPage's software provides that assurance.

7.      Beyond the anticompetitive exchange of nonpublic and competitively sensitive information among competing property managers, Defendant RealPage uses additional mechanisms to facilitate coordination among cartel members and prevent cheating by conspiracy participants.  First, by allowing property managers to outsource their rent-setting process, RealPage causes them to consider higher rent prices than they ever would have before.  In the

words of an executive at one of RealPage's major clients: "The beauty of YieldStar is that it pushes you to go places that you wouldn't have gone if you weren't using it."[2]

8.     Second, Defendant RealPage polices cartel members by applying heavy pressure on them to accept the algorithm's suggested price at least 80%-90% of the time.  The AI Revenue Management service includes more than its rent-setting algorithm.  Clients can expect constant communication with one or more of RealPage's Revenue Management Advisors who provide "expert oversight of [clients'] pricing strategy."[3]  Any client property manager who chooses to diverge from the algorithm's price is expected to provide justification to a Revenue Management Advisor.

9.     Third, the software also recommends lease renewal dates for its clients' properties. Using Defendant RealPage's vast store of data on lease transactions, the algorithm suggests dates that are staggered to avoid temporary periods of oversupply resulting from the natural ebb and flow of the market.[4]  This further reduces the incentive for property managers to undercut would-be competitors, which is the strongest during these temporary oversupply periods.

10.     Fourth, Defendant RealPage facilitates direct information exchanges between competitors and provides opportunities for direct coordination of prices.  It hosts online forums,

---

[2]     Heather Vogell, *Rent Going Up? One Company's Algorithm Could Be Why.*, PROPUBLICA (Oct. 15, 2022), https://www.propublica.org/article/yieldstar-rent-increase-realpage-rent (quoting Kortney Balas, director of revenue management at JVM Realty).

[3]     *RealPage AI Revenue Management*, REALPAGE, INC., https://www.realpage.com/asset-optimization/revenue-management/ (last visited Dec. 6, 2022).

[4]     Revenue Management: Proven in Any Market Cycle: See How These Companies Outperformed During Downturns (2020) (ebook), https://www.realpage.com/ebooks/outperform-in-a-down-market/.

organizes in-person events for its clients,[5] and maintains standing committees of cartel members to advise on pricing strategy.[6]

11.    As the property managers acknowledge, they are competitors.  Yet, RealPage's clients shared a common goal of increasing rent prices across the board and understood that RealPage – which has been explicit that its aim is to help its clients "outperform the market [by] 3% to 7%"[7] – was the means by which to do it.  RealPage's clients include many of the largest property managers in the Greater Boston Metro Area, who control a majority of the rental units in desirable neighborhoods.  A recent analysis conducted by ProPublica showed that rents in areas where RealPage clients control a high percentage of rental units have increased at a significantly higher rate than those where the company's influence is weaker.[8]

12.    Specifically, within the Greater Boston Metro Area, rents rose while vacancy remained the same from 2015-2020,[9] demonstrating that the forces of supply and demand no longer control the price of rent in the Greater Boston Metro Area.

13.    Defendants' price fixing conspiracy is a *per se* unlawful restraint of trade under Section 1 of the Sherman Act.  It has resulted in artificially inflated rent prices and a diminished supply of rental units in the Greater Boston Metro Area.  Plaintiff and the Class, who rent in the Greater Boston Metro Area from property managers that use RealPage's software, paid significant

---

[5]    *See* Susan Gaide, *Real World 2022 Customer Conference Recap*, REALPAGE, INC., (July 29, 2022), https://www.realpage.com/blog/realworld-2022-customer-conference-recap/ (last visited Dec. 9, 2022).

[6]    *User Group Overview*, REALPAGE, INC., https://www.realpage.com/user-group/overview/ (last visited Dec. 6, 2022).

[7]    Vogell, *supra* note 2 (citing RealPage web page which has since been removed).

[8]    *Id*.

[9]    Due to conditions caused by the COVID-19 pandemic that will take years to unwind (including generally slowed construction of new apartment units and restrictions on the availability of evictions), current vacancy numbers do not accurately reflect market forces.

overcharges on rent and suffered harm from the reduced availability of rental units they could reasonably afford.

## II.    JURISDICTION AND VENUE

14.    Plaintiff brings this antitrust class action lawsuit pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§15 and 26), to recover treble damages and the costs of suit, including reasonable attorneys' fees, for the injuries sustained by Plaintiff and members of the Class; to enjoin Defendants' anticompetitive conduct; and for such other relief as is afforded under the laws of the United States for Defendants' violations of Section 1 of the Sherman Act (15 U.S.C. §1).

15.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§1331, 1337, and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§15(a), 26).

16.    Venue is proper in this District pursuant to Sections 4, 12, and 16 of the Clayton Act (15 U.S.C. §§15, 22, and 26), and pursuant to 28 U.S.C. §1391(b), (c), and (d), because, at all relevant times, one or more of the Defendants resided, transacted business, was found, was licensed to do business, and/or had agents in this District.

17.    This Court has personal jurisdiction over each Defendant because, among other things, each Defendant:  (a) transacted business throughout the United States, including in this District; (b) leased residential units to individuals throughout the United States, including in this District; and/or (c) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including in this District.

18.    The activities of the Defendants and their co-conspirators, as described herein, were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on the interstate commerce of the United States.

19.     No other forum would be more convenient for the parties and witnesses to litigate this case.

### III.     THE PARTIES

20.     Plaintiff David Precht is a resident of Acton, Massachusetts. He has rented a residential unit in a property known as Avalon Acton in Acton, Massachusetts from 2019 through the date of this filing.  During that time, Defendant AvalonBay Communities Inc., managed this property using RealPage software.  Consequently, David Precht paid higher rental prices by reason of the violations alleged herein.

21.     Defendant RealPage is a corporation headquartered in Richardson, Texas, organized and existing under the laws of Delaware.  RealPage provides software and services to managers of residential rental apartments, including the YieldStar/AI Revenue Management software described herein.  RealPage was a public company from 2010 until December 2020, when it was purchased by Chicago-based private equity firm Thoma Bravo, LP, in a transaction that valued RealPage at approximately $10.2 billion.[10]  At that time, RealPage had over 31,700 clients, including each of the 10 largest multifamily property management companies in the U.S.[11]

22.     Defendant Greystar Real Estate Partners, LLC ("Greystar") is a limited liability company headquartered in Charleston, South Carolina, organized and existing under the laws of Delaware.  Greystar is by far the largest manager of residential rental apartments in the country, with over 698,000 units under its management, including approximately 55 properties in the Greater Boston Metro Area.

---

[10]     Press Release, RealPage, Inc., Thoma Bravo Completes Acquisition of RealPage (Apr. 22, 2021), https://www.realpage.com/news/thoma-bravo-completes-acquisition-of-realpage/.

[11]     RealPage Inc., Annual Report (Form 10-K) at 6 (Mar. 1, 2021).

23.    Defendant Cushman & Wakefield, Inc. ("Cushman & Wakefield") is a corporation headquartered in New York, New York, organized and existing under the laws of Delaware. Cushman & Wakefield manages over 172,000 apartments nationally, including approximately 94 properties in the Greater Boston Metro Area.

24.    Defendant Lincoln Property Company ("Lincoln") is a corporation headquartered in Dallas, Texas, organized and existing under the laws of Texas.  Lincoln is a residential apartment manager with over 210,000 rental units under its management, including approximately 36 properties in the Greater Boston Metro Area.

25.    Defendant Peabody Properties, Inc. ("Peabody") is a corporation headquartered in Braintree, Massachusetts, incorporated under the laws of Massachusetts.  Peabody manages over 15,000 rental units nationally, including approximately 148 properties in the Greater Boston Metro Area.

26.    Defendant WinnCompanies LLC and WinnResidential Manager Corp. (collectively "Winn") are a family of companies headquartered in Boston, Massachusetts, organized and existing under the laws of Massachusetts.  Winn manages over 103,000 rental units nationally, including approximately 20 properties in the Greater Boston Metro Area.

27.    Defendant UDR, Inc. ("UDR") is a real estate investment trust headquartered in Highlands Ranch, Colorado, and incorporated under the laws of Maryland.  UDR manages over 53,000 rental units, including approximately 14 properties in the Greater Boston Metro Area.

28.    Defendant SHP Management Corp. ("SHP") is a corporation headquartered in Cumberland Foreside, Maine, incorporated under the laws of Maine.  SHP manages approximately 50 multi-unit residential rental properties nationally, including approximately 12 properties in the Greater Boston Area.

29.     Defendant The Related Companies, Inc. ("TRC") is a corporation headquartered in New York, New York, incorporated under the laws of Delaware.  TRC manages over 65,000 rental units nationally, including approximately 4 properties in the Greater Boston Metro Area.

30.     Defendant Simpson Property Group, LLLP ("Simpson") is a limited partnership headquartered in Denver, Colorado, formed under the laws of Delaware.  Simpson manages approximately 100 multi-unit residential rental properties nationally, including one property in the Greater Boston Metro Area.

31.     Various other persons, firms, and corporations not named as defendants have participated as co-conspirators with Defendants and have performed acts and made statements in furtherance of the conspiracy.  The Defendants are jointly and severally liable for the acts of their co-conspirators whether or not named as defendants in this Complaint.

32.     Whenever reference is made to any act of any corporation, the allegation means that the corporation engaged in the act by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.  Each of the Defendants named herein acted as the agent of or for the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

33.     Defendants are also liable for acts done in furtherance of the alleged conspiracy by companies they acquired through mergers and acquisitions.

## IV.     FACTUAL ALLEGATIONS

### A.     Historical Competition Among Residential Property Managers

35.     Before the introduction of software like YieldStar, competition in the rental housing market was driven by property managers' desire to keep occupancy levels in their buildings as

high as possible and to keep turnover among their tenants down.[12]  In addition to lost rent revenue caused by letting apartments sit empty, the costs of owning and maintaining a rental apartment are not significantly different whether the unit is occupied or not.  This provides a strong incentive for property managers to lower their rents to fill vacant units.  While property managers knew in theory that if they all resisted this temptation, they would all benefit from higher average rents, any individual property manager that lowered its rents to fill vacancies while the others did not would be able to gain market share at the others' expense.

36.     As Donald Davidoff, the principal developer of the competing price-setting software that Defendant RealPage acquired in 2017, Lease Rent Options, explained in a 2020 blog post: "All [property managers] would be better off limiting their rent reductions; however, should one [property manager] lower their rents while the others don't, then that operator would outperform. The result can be a race to the bottom that is not good for anyone, but the fear of missing out coupled with laws prohibiting collusion make this the most likely outcome."[13]  This so-called "race to the bottom" might be bad for all property managers but is, of course, good for renters.  It represents nothing beyond healthy price competition.

37.     Absent collusion, property managers could not unilaterally raise rents above market rates—any property manager that did so would lose tenants to its competitors who offered rental units at market rates, granting them a higher share of the available profits.  This dynamic causes rental prices in a competitive marketplace to be sensitive to changes in demand.  For example, rents have historically gone up quickly in neighborhoods that become trendy, or when new public transportation infrastructure is added, and have fallen in areas where businesses

---

[12]     *Supra* note 4.

[13]     Donald Davidoff, *They're Heckling Revenue Management Again*, THE DEMAND SOLUTIONS BLOG (Aug. 18, 2020), https://www.d2demand.com/mfhblog/theyre-heckling-revenue-management-again.

close, or that new generations find less desirable than previous ones did. Any number of factors that made people want to live in a certain area or a certain type of apartment could cause rents to rise or fall accordingly. Rents were also historically responsive to changes in renters' average income.

38.     As described more fully below, Defendants' conspiracy avoids a race to the bottom, but it does so at the financial expense of their customers—the renters. It allows property managers to hike rents at a faster pace when demand is strong without needing to lower them when it is weak. It eases natural competitive constraints and causes renters to spend higher and higher portions of their incomes on housing.

### B.    RealPage and AI Revenue Management

39.     Defendant RealPage markets a "comprehensive platform of data analytics and on demand software solutions and services for the rental real estate industry."[14] Its clients are managers of residential rental apartments, to which it offers an array of products for: (1) marketing and leasing of apartments; (2) resident experience (including IT portals and rent payment software); (3) site management; (4) vendor and expense management; (5) budgeting and investment; (6) accounting; (7) data analytics; and (8) so-called "revenue management" – advisory services on how to obtain higher rents on every unit. This "revenue management" service is the fulcrum of Defendants' anticompetitive scheme.

40.     Defendant RealPage was founded in 1998, and in 2002 it acquired the original YieldStar software from Camden Property Trust ("Camden"), a large real estate investment trust and manager of apartment buildings.[15] Two years later, the company hired Jeffrey Roper as its

---

[14]     *Supra* note 11, at 6.

[15]     Press Release, RealPage, Inc., RealPage Acquires YieldStar Multifamily Revenue Management System (July 19, 2002), https://www.realpage.com/news/realpage-acquires-yieldstar-multifamily-revenue-management-system/.

principal scientist to improve YieldStar's performance and grow its client base.[16]  Roper saw potential in the software as a means for RealPage's customers to increase their revenue by maintaining higher average rents, but he realized that to function properly, the algorithm needed huge amounts of detailed data regarding rent prices and occupancy of individual units.[17]  RealPage began collecting information from its clients and other sources in a "data warehouse," which the algorithm could mine.  Beyond rent prices and occupancy rates, this data included records of actual lease transactions, signed lease documents, lease renewal dates, records of rent payments, and detailed data on tenants and their finances.

41.    Roper had previously helped design similar price-setting software for Alaska Airlines that also facilitated information exchange and price-fixing, according to the DOJ.[18]  During his tenure as director of revenue management, Alaska Airlines and its competitor airlines began using common software to exchange information regarding planned routes and ticket prices among themselves before that information became public.[19]  The software allowed the airlines to avoid price wars that would have lowered ticket prices.  The Justice Department's Antitrust Division filed suit against eight of the largest U.S. airlines, alleging that the software-enabled information exchange amounted to anticompetitive price fixing under the antitrust laws.[20]  A government economist calculated that the scheme cost consumers up to $1.9 billion.[21]  All eight airlines

---

[16]    *See* Vogell, *supra* note 2.

[17]    *See id.*

[18]    Press Release, U.S. Dep't of Just., Justice Department Settles Airlines Price Fixing Suit, May Save Consumers Hundreds of Millions of Dollars (Mar. 17, 1994), https://www.justice.gov/archive/atr/public/press_releases/1994/211786.htm.

[19]    Vogell, *supra* note 2.

[20]    Press Release, U.S. Dep't of Just., Justice Department Files Price Fixing Suit Against Eight Airlines and Fare Dissemination System (Dec. 21, 1992), https://www.justice.gov/archive/atr/public/press_releases/1992/211323.htm.

[21]    *Supra* note 18.

eventually entered into consent decrees requiring them to eliminate the information exchange features of the software that had enabled the conspiracy.[22]  At one point during the investigation, federal agents removed a computer and documents from Roper's office at Alaska Airlines.[23]

42.    Much like the airlines' price-fixing cartel, Defendants' cartel avoids price wars and the "race to the bottom" during periods of oversupply.  As Defendant RealPage declares to potential clients in its advertising materials: "You don't have to sacrifice rent growth during a softening market."[24]

43.    Naturally, YieldStar's coordinated pricing strategy became more and more effective as more property managers implemented it.  To this end, Defendant RealPage began buying up similar and competing software companies, and it has completed 26 acquisitions since its founding.[25]  The most important of these transactions came in 2017, when RealPage acquired Lease Rent Options ("LRO"), a company which offered a similar rent-setting software that was YieldStar's strongest rival.  Instead of relying on nonpublic data from competitors, however, LRO's algorithm used only public market data as input.  LRO's chief architect, Donald Davidoff, designed it that way specifically to avoid the potential antitrust violations arising from the use of nonpublic data to coordinate prices among competitors.[26]

44.    LRO's software was not the most valuable piece of the acquisition for Defendant RealPage, however – its customer base was.  At the time of the merger, RealPage was pricing 1.5

---

[22]    *Id.*

[23]    Vogell, *supra* note 2.

[24]    *Supra* note 4.

[25]    Bloomberg, Company Report, RealPage, Inc. (generated Nov. 1, 2022).

[26]    Vogell, *supra* note 2.

million units.  That number doubled with the acquisition.[27]  RealPage rebranded the product AI Revenue Management, and its client base and influence on rental markets in urban areas across the country continued to grow.  RealPage's website currently claims that its clients use AI Revenue Management to set the price for more than 4 million rental units.[28]  While the DOJ issued a so-called "Second Request" in connection with the proposed merger due to its potential effects on competition, the DOJ took no further action, and RealPage completed the acquisition.[29]

45.    These four million units provide only a piece of the data available for Defendant RealPage's algorithm to mine, however.  According to RealPage's last annual report before being acquired by Thoma Bravo, as of December 31, 2020, its "client base of over 31,700 clients used one or more of [its] integrated data analytics or on demand software solutions to help manage the operations of approximately 19.7 million rental real estate units."[30]

46.    Defendant RealPage's vast client base provides it with real-time data on every aspect of the rental housing market, including actual rent prices as opposed to advertised rents – data which was previously unavailable to landlords.  RealPage advertises that the algorithm "crunches ***millions of transactions each night,*** pinpointing price shifts for ***every single unit*** on the platform at any point in time."[31]

---

[27]    *Id.*

[28]    *Supra* note 11.

[29]    Vogell, *supra* note 2.

[30]    *See* RealPage Inc., Annual Report (Form 10-K) at 6 (March 1, 2021).

[31]    *YieldStar Calculates the Right Rent Price at the Right Time* at 00:32-00:41, REALPAGE VIDEOS, https://www.realpage.com/videos/yieldstar-measures-price-elasticity/ (last visited Nov. 1, 2022).  [Emphasis added.]

47.     Figure 1, below, is a diagram from an eBook published by Defendant RealPage on its website.[32] It demonstrates how RealPage aggregates the data (including nonpublic lease transaction data) which enables RealPage to coordinate pricing among its clients.

**Figure 1**



48.     By enabling property managers to outsource lease pricing decisions to the software, Defendant RealPage has transformed rental markets.  Where lease prices were formerly set to maximize occupancy rates, increasing revenue on individual rental units has become the driving force.  David Hannan, senior vice president at the Morgan Group, a Houston-based property manager, which grew revenue 5% above expectations when it implemented YieldStar, characterized the transformation like this: "My generation grew up worshipping the occupancy gods.  We learned that if you were not 95 percent-plus occupied, the asset was failing.  But that's not necessarily true anymore . . . [t]his totally turns the industry upside down."[33]   RealPage characterizes this transformation as a shift from an "occupancy focus" to "rent growth focus."[34]

49.     Other traditional aims for a healthy rental property, such as low turnover rates, have also been abandoned.  Ric Campo, the CEO of Camden said his turnover rates increased around 15 percentage points in 2006 after implementing YieldStar.  Despite that increase in turnover rates,

---

[32]     3 Ways to Leverage AI for Maximum NOI 8 (2022) (ebook), https://www.realpage.com/ebooks/leverage-ai-maximum-noi/.

[33]     Joe Bousquin, *In the Back Office, Revenue Management Software is Causing a Revolution*, MULTIFAMILY EXECUTIVE (Apr. 20, 2009), https://www.multifamilyexecutive.com/technology/in-the-back-office-revenue-management-software-is-causing-a-revolution_o.

[34]     *Supra* note 4, at 3.

Camden's overall same-property revenue grew over seven percent in its first year using YieldStar. "What we found," Campo said, "was that driving our turnover rate up actually captured additional revenue."[35]   While Camden's turnover expenses increased by $2.5 million, revenue increased $12.5 million.  According to Campo, "[T]he net effect of driving revenue and pushing people out was $10 million in income."[36]

50.     Additionally, Defendant RealPage provides its customers with real-time information about their competitors sufficient to avoid oversupply of units caused by natural ebbs and flows in the market.  The algorithm uses the occupancy data it collects to recommend lease renewal dates that are staggered to avoid any period of oversupply.  Property managers can then hold units vacant for a period, while keeping rent prices inflated.[37]  This strategy of staggering of lease renewal dates smooths out natural fluctuations of supply and demand, which further reduces any incentive for Defendants and their coconspirators to undercut their inflated prices.  This incentive is always the greatest in periods of oversupply, when falling revenues could be replaced by achieving full occupancy at reduced rents.

### C.    Property Managers Who Adopted YieldStar/AI Revenue Management Did so with the Common Goal of Raising Rent Prices

51.     Property managers who use YieldStar/AI Revenue Management do so with the explicit and common goal of increasing rents for all members of the cartel by using coordinated algorithmic pricing.  Defendant RealPage advertises that its customers "outperform the market by

---

[35]     Bousquin, *supra* note 33.

[36]     *Id.*

[37]     *Supra* note 4, at 4-5.

2%-7% year over year,"[38] by switching from an "occupancy focus" to a "rent growth focus."[39] RealPage's clients find its revenue management services particularly helpful because those services allow the property managers to "make sure we're limiting our supply when there isn't too much demand."[40]  As one property manager described in a promotional video on RealPage's website, YieldStar takes on the burden of "implementing the increases in rents . . . it's running the lease expiration for us and we're not manually doing it which means we're increasing our revenue for those units."[41]

52.    To join the cartel, property managers must agree to abide by certain conditions. They must provide Defendant RealPage with real-time access to detailed, nonpublic data regarding their residential leases.  They must agree to outsource daily pricing and ongoing revenue oversight to RealPage.  Importantly, they agree to rent their units at the algorithm's recommended price, even where it is higher than they would have previously considered.  While it is possible for property managers to reject the algorithm's suggested price for a given unit, RealPage uses multiple mechanisms to enforce what it refers to as pricing "discipline" or "courage."  The result is that property managers adopt at least 80% and as much as 90% of suggested rates.[42]

---

[38]    *Introducing AI Revenue Management: Next-Generation Price Optimization That Unlocks Hidden Yield,* REALPAGE, INC. (October 28, 2020), https://www.realpage.com/storage/files/pages/pdfs/2021/02/ai-revenue-management-lookbook-nov20.pdf.

[39]    *Supra* note 4, at 3.

[40]    *RealPage Revenue Management Maximizes Market Opportunity* at 01:29-01:32, REALPAGE VIDEOS (Dec 2, 2019), https://www.realpage.com/videos/revenue-management-maximizes-market-opportunity/ (interview with John Kirchmann, CFO of IRET Property Management).

[41]    *YieldStarTM Revenue Management Optimizes Rent Pricing* at 00:30-00:42, REALPAGE VIDEOS (Sept. 10, 2019), https://www.realpage.com/videos/yieldstar-optimizes-rent-pricing/ (testimonial of Holly Casper, Vice President of Operations for RKW Residential).

[42]    *See* Vogell, *supra* note 2.

53.     Defendant RealPage provides participating property managers with daily recommended rents for available rental units.  The property manager must either accept these rates or provide justification to a RealPage Revenue Management Advisor for their divergence from the recommended price.  And, according to a former RealPage executive, property managers only ever offered minimal pushback on the recommended rates.[43]

54.     Unlike renters, Defendant RealPage's customers (the property managers) are fully aware when they sign up that the higher rents achieved by using the algorithm are the result of coordinated pricing among competing property managers.  Before the introduction of rent-setting software, markets for residential leases were characterized by a prisoner's dilemma.  While higher rents across the board would benefit all landlords, one self-interested landlord could outperform the rest by undercutting the price and achieving full occupancy.  Without assurances that competitors will refrain from undercutting rent prices, individual landlords are forced to price their units to maximize occupancy.

55.     By enforcing price discipline and setting rents that result in lower occupancy rates, Defendant RealPage provides assurances that all property managers using its software are doing the same thing – raising rents and accepting lower occupancy instead of lowering the price to fill units.  In this way, RealPage enables property managers to overcome the prisoner's dilemma that prevented coordinated pricing in the historical market for residential rental apartments.[44]

56.     Defendant RealPage's clients are also aware that the rent growth they achieve is based on real-time sharing of nonpublic lease transactions and pricing data.  RealPage calls this information exchange "continuous optimization through connected intelligence" and brags that it

---

[43]     *See id.*

[44]     *See* Salil K. Mehra, *Price Discrimination-Driven Algorithmic Collusion: Platforms for Durable Cartels*, 26 STAN. J.L. BUS. & FIN. 171, 197-203 (2021).

is "[b]uilt on the market's largest real-time data set."[45]  Coordinated algorithmic pricing allows property managers to, in RealPage's own words, "outsource daily pricing and ongoing revenue oversight" to RealPage, allowing RealPage to set prices for client property managers' properties "as if we [RealPage] own them ourselves."  Put differently, the software allows the independent property managers to operate as if they were one company setting prices.

### D. The Conspiracy Caused Inflated Rental Prices and Reduced Occupancy of Residential Rental Units in the Greater Boston Metro Area

57.    Defendant RealPage's model works to increase revenue by raising rent prices while accepting lower occupancy levels.  RealPage has not been shy about this mechanism of action. During a 2017 earnings call, then-CEO of RealPage Steve Winn offered as an example one large property company, managing over 40,000 units, which learned it could make more profit by operating at a lower occupancy level that "would have made management uncomfortable before."[46]  Prior to adopting YieldStar, the company had targeted 97% or 98% occupancy rates in markets where it was a leader.  After outsourcing rent prices to the algorithm, the company began targeting three to four percent revenue growth while operating at a 95% occupancy rate.[47]

58.    Defendant RealPage's software not only facilitates price hikes, but it also allows conspirators to *maintain* higher prices.  RealPage claims that Defendant property managers and their co-conspirators were able to maintain rent prices 7% above the competitive market rate. Speaking at a RealPage webcast, America Melragon, a former VP of revenue management for IRT, discussed how property managers can stabilize rents by using RealPage's software. According to Melragon, "We've noticed . . . competitors that are manually pricing have already

---

[45]     *Supra* note 38.
[46]     Vogell, *supra* note 2.

[47]     *Id*.

started to experience pretty significant swings in their effective price. . . .  For us, really having that insight into our own individual supply and demand exposure has helped our price pretty much stay in line with where we anticipated it to be."[48]

59.    Defendants and their co-conspirators are aware that the higher revenues they obtain using Defendant RealPage's software are the result of increasing average rent prices in the neighborhoods they serve.  In a video shown at a conference for real estate executives in the summer of 2021, RealPage vice president Jay Parsons noted that average rents had recently shot up by 14%.  "Never before have we seen these numbers," he said.[49]  Parsons then asked Andrew Bowen, another RealPage executive, what role he thought the company had played in the unprecedented increase.  "I think it's driving it, quite honestly," Bowen replied.[50]

60.    Defendants' conspiracy allows property managers to hike rents even higher when demand is strong without needing to lower them when it is weak.  It untethers rent prices from their natural constraints, forcing renters to spend more money than they would have in a competitive rental market.

61.    Specific to the Greater Boston Metro Area, Defendants have taken advantage of the skyrocketing cost of homeownership.  From 2012 to 2022, the percentage of houses sold in the Greater Boston Metro Area that would have been affordable to a family earning the median income fell dramatically, from ~71% to ~27%.[51]

---

[48]    *IRT Gains Pricing Stability with RealPage Revenue Management* at 00:02-00:46, REALPAGE VIDEOS (June 17, 2020), https://www.realpage.com/videos/irt-gains-pricing-stability/.

[49]    Vogell, *supra* note 2.

[50]    *Id*.

[51]    *The NAHB/Wells Fargo Housing Opportunity Index: Complete History by Metropolitan Area (2012-Current)*, NAT'L ASS'N OF HOME BUILDERS, https://www.nahb.org/news-and-economics/housing-economics/indices/housing-opportunity-index (last accessed December 6, 2022); *see also Comprehensive Housing Market Analysis: Boston, Massachusetts*, U.S. DEP'T OF HOUS. & URBAN DEV. at 19, https://www.huduser.gov/portal/chma/ma.html (last accessed Dec. 5, 20220).

62.    As a result of the drastic increase in home prices, more and more families in the Greater Boston Metro Area are renting.

63.    Defendants and co-conspirators control hundreds of thousands of apartment units in the Greater Boston Metro Area, including tens of thousands of units in the most desirable neighborhoods.

64.    With the help of RealPage, from 2016 to the onset of the COVID-19 pandemic in 2020, Defendants were able to increase rents every year despite a trend of rising vacancies:

**Figure 2: Rent vs. Vacancies in Greater Boston Metro Area, 2014-2022**



**E.    "Plus Factors" in the Residential Rental Market Provide Additional Evidence of a Price Fixing Conspiracy**

65.     Prominent legal and economic antitrust scholars studying collusive behavior have identified certain "plus factors," which are "economic actions and outcomes, above and beyond parallel conduct by oligopolistic firms, that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action," and therefore support an inference of collusion.[52]   Each plus factor that is present constitutes a piece of circumstantial evidence supporting active collusion, as opposed to mere conscious parallelism.  The factors that provide the most probative value and lead to a strong inference of explicit collusion are referred to as "super plus factors."[53]

66.     Here, several plus and super plus factors support the plausible inference that Defendants are members of a *per se* unlawful price fixing cartel.  These include: (i) Defendants' exchange of competitively sensitive information; (ii) the presence of a price-verification scheme; (iii) a motive to conspire; (iv) opportunities and invitations to collude; (v) high barriers to entry; (vi) high switching costs for renters; (vii) high market concentration; (viii) stability in the market shares of large residential apartment managers; and (ix) maintenance of excess capacity during periods of rising prices.

67.     *First*, the reciprocal sharing of firm-specific competitively sensitive information that would normally remain private is a "super plus factor" that leads to a strong inference of active collusion.[54]   As described above, Defendant RealPage requires client property managers to input data on actual rents paid and occupancy rates, along with detailed records of lease transactions. This data, which would normally be kept private, is fed into the algorithm which sets coordinated

---

[52]     William E. Kovacic, *Plus Factors and Agreement in Antitrust Law*, 110 MICH. L. REV. 393, 393 (2011).

[53]     *See id*. at 396-97.

[54]     Christopher R. Leslie, *The Probative Synergy of Plus Factors in Price-Fixing Litigation*, 115 NW. UNIV. L. REV. 1581, 1608 (2021).

rents among competing property managers.  Importantly, individual property managers would be competitively disadvantaged by providing private data to other property managers unilaterally, and rational actors will only do so with the expectation that they will benefit from similar private information shared by its competitors.

68.     *Second*, Defendant RealPage provides participating property managers with a price-verification scheme.  As described above, RealPage pushes its clients to accept the algorithm's rent price at least 80%-90% of the time and clients cannot freely diverge from the algorithm's price.  This type of price-verification makes little sense absent collusion.[55]

69.     *Third*, Defendant RealPage provides property managers with a motive to conspire by advertising its software and claiming it can increase revenue by 3% to 7%.[56]

70.     *Fourth*, the YieldStar/AI Revenue Management software itself is an opportunity to coordinate prices that was previously unavailable, and Defendant RealPage's advertisements are naked invitations to collude.  Additionally, RealPage hosts online forums and in-person conferences for property managers[57] and maintains standing committees of cartel members to advise on pricing strategy, all of which provide opportunities for more direct collusion. [58]

71.     *Fifth*, the market for residential apartment rentals in the Greater Boston Metro Area is highly concentrated.  Desirable neighborhoods in many major cities are dominated by large corporate property managers, such as Defendant Greystar and Camden, which are themselves increasingly controlled by even larger private equity firms.[59]  For example, ProPublica found that

---

[55]     *Id.* at 1602.

[56]     *Supra* note 4, at 6.

[57]     *Supra* note 5.

[58]     *Supra* note 6.

[59]     Heather Vogell, *When Private Equity Becomes Your Landlord,* ProPublica (Feb. 7, 2022), https://www.propublica.org/article/when-private-equity-becomes-your-landlord.

in one popular Seattle neighborhood, 70% of the apartments were managed by just 10 property managers, all of which were using Defendant RealPage's pricing software.[60]

72.    *Sixth*, multifamily residential building owners and operators face significant entry barriers.  These include the high cost of acquiring property and establishing a property management infrastructure as well as ongoing costs of building maintenance and regulatory compliance.  Even small multifamily rental properties cost millions of dollars to acquire.  Larger properties run into the hundreds of millions of dollars to own and manage and take several years and significant experience to build or acquire.  Thus, new entrants into the residential real estate leasing market are unlikely to discipline cartel pricing.

73.    *Seventh*, there are significant switching costs that prevent effective price competition in rental markets.  In other markets with low switching costs, consumers can stop purchasing a particular manufacturer's product when its prices are no longer competitive.  Rental contracts, however, are usually for a term of at least one year.  Renters who break their lease during the rental term will likely face significant financial penalties for doing so.  These penalties may include, among other things: the forfeiture of a security deposit (typically at least one month's rent), or the requirement that the renter is to continue paying rent until the property is re-leased.  Because of these high switching costs, renters cannot readily switch from one rental unit to another in the event their current rental unit no longer aligns with market prices.  This creates a certain degree of natural market power for owners of rental properties and makes collusion more effective because even if a competing property manager were to offer lower prices on available units, customers will not typically break their leases to enter a lease for a lower cost property given the substantial cost of doing so.

---

[60]    Vogell, *supra* note 2.

74.    *Eighth*, the relative market share held by the largest residential apartment managers has been remarkably stable.  Since 2018, the list of the top 10 apartment managers in the country has been virtually identical, with a total of 13 companies appearing on the combined list.  The small variance is due largely to the merger between two of the top five apartment managers in 2020.[61]  Stability of relative market shares indicates a market that lacks dynamic competition.

75.    *Finally*, Defendant RealPage's clients maintain excess capacity while simultaneously raising prices.  As described above, the ability of RealPage's clients to increase their revenue depends on them continuing to raise rental prices while simultaneously maintaining a higher vacancy rate than they would have independently.  This is evidence of collusion because in a competitive market, firms with surplus inventory normally reduce prices to grow market share.[62]  As described above, RealPage and its clients are open about how they can achieve higher revenues while maintaining a lower occupancy rate than they could setting prices independently.

## V.    RELEVANT MARKET

76.    The relevant product market is the market for residential units for rent, and the relevant geographic market is the Greater Boston Metro Area, as defined above.

77.    Multifamily real estate leases in the Greater Boston Metro Area comprise a distinct product market and geographic area.

---

[61]    *NMHC 50 Largest Apartment Managers*, NATIONAL MULTIFAMILY HOUSING COUNCIL, https://www.nmhc.org/research-insight/the-nmhc-50/top-50-lists/2022-top-managers-list/ (2022); https://www.nmhc.org/research-insight/the-nmhc-50/top-50-lists/2021-top-manager-list/ (2021); https://www.nmhc.org/research-insight/the-nmhc-50/top-50-lists/2020-top-managers-list/ (2020); https://www.nmhc.org/research-insight/the-nmhc-50/top-50-lists/2019-managers-list/ (2019); https://www.nmhc.org/research-insight/the-nmhc-50/top-50-lists/2018-manager-list/ (2018) (last visited Nov. 1, 2022).

[62]    *See* Leslie, *supra* note 54, at 1606.

78.     Residential units for rent in the Greater Boston Metro Area comprise a distinct product market, one that is not realistically competing with other municipalities because each municipality is distinct and has a number of factors affecting the price of living in that respective location.

79.     Consumers do not consider apartments, condominiums, or houses for purchase as substitutes for residential units for rent because, among other reasons, purchase of real estate requires the ability to make a substantial down payment and to obtain financing.  Nor is single-family real estate considered an economic substitute for multifamily residential real estate.  For example, single-family properties typically do not offer amenities and security.

80.     Geographically, given that commuting distance to a place of work or school is a significant (if not the primary) geographic constraint on where a person chooses to live, renters in the Greater Boston Metro Area do not consider multifamily residential leases in other metro areas, even ones that are relatively close by like New York City, New York; Hartford, Connecticut; or Portland, Maine as adequate substitutes for multifamily residential leases in the Greater Boston Metro Area, because the daily commute from those cities to Boston would take multiple hours in each direction.

## VI.    CLASS ACTION ALLEGATIONS

81.     Plaintiff brings this action on behalf of himself and all others similarly situated as a class action under Federal Rules of Civil Procedure 23(a) and 23(b)(3), seeking damages, as well as equitable and injunctive relief, on behalf of the following Class:

> All persons and entities who paid rent for a residential unit in the Greater Boston Metro Area which was owned, managed, or controlled by a Defendant using YieldStar, AI Revenue Management, or any other RealPage software from January 1, 2016, to the present.

82.     Specifically excluded from this Class are Defendants; the officers, directors, or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant.  Also excluded from this Class are any federal, state, or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, any juror assigned to this action, and any co-conspirator identified in this action.

83.     The Class is so numerous as to make joinder impracticable.  Plaintiff does not know the exact number of Class members because such information presently is in the exclusive control of Defendants.  Plaintiff believes that due to the nature of the residential rental market there are likely tens of thousands of Class members in the Greater Boston Metro Area.

84.     Common questions of law and fact exist as to all members of the Class.  Plaintiff and the Class were injured by the same unlawful price fixing conspiracy, and Defendants anticompetitive conduct was generally applicable to all the members of the Class, and relief to the Class as a whole is appropriate.  Common issues of fact and law include, but are not limited to the following:

(a)     Whether Defendants and their co-conspirators engaged in a combination or conspiracy to fix, raise, maintain or stabilize rent prices for residential units in the Greater Boston Metro Area;

(b)     The duration of the conspiracy alleged herein and the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

(c)     Whether such combination or conspiracy violated the federal antitrust laws;

(d)     Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to Plaintiff and other members of the Class;

(e)    Whether Defendants caused Plaintiff and the Class to suffer damages in the form of overcharges on rent for residential units;

(f)    The appropriate class-wide measure of damages; and

(g)    The nature of appropriate injunctive relief to restore competition in the Greater Boston Metro Area residential apartment rental market.

85.    Plaintiff's claims are typical of the claims of Class members, and Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff and all members of the Class are similarly affected by Defendants' unlawful conduct in that they paid artificially inflated rent for residential units managed cartel members.

86.    Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class. Plaintiff's interests are coincident with and typical of, and not antagonistic to, those of the other members of the Class.

87.    Plaintiff has retained counsel with substantial experience litigating complex antitrust class actions in myriad industries and courts throughout the nation.

88.    The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including issues relating to liability and damages.

89.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might

not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action. Moreover, the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

90.    Plaintiff knows of no difficulty likely to be encountered in the maintenance of this action as a class action under Federal Rule of Civil Procedure 23.

## VII.    ANTITRUST INJURY

91.    Defendants' anticompetitive conduct had the following effects, among others:

(a)    Competition among Defendants has been restrained or eliminated with respect to residential rental units in the Greater Boston Metro Area;

(b)    The price of residential rental units in the Greater Boston Metro Area has been fixed, stabilized, or maintained at artificially high levels; and

(c)    Individuals have been deprived of free and open competition.

92.    Defendants' violations of the antitrust laws have caused Plaintiff and the Class to pay higher prices for residential rental units in the Greater Boston Metro Area than they would have in the absence of Defendants' illegal contract, combination, or conspiracy, and as a result, have suffered damages in the form of overcharges paid on their rental units.

93.    This is an injury of the type that the antitrust laws were meant to punish and prevent.

## VIII.    FRAUDULENT CONCEALMENT

94.    Plaintiff and members of the Class had neither actual nor constructive knowledge of the facts constituting their claim for relief. Plaintiff and members of the Class did not discover and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until shortly before filing this Complaint. Defendants engaged in a

secret conspiracy that did not reveal facts that would put Plaintiff or the Class on inquiry notice that there was a conspiracy to fix residential rental unit prices in the Greater Boston Metro Area.

95.    The combination and conspiracy alleged herein was fraudulently concealed by Defendants by various means and methods, including, but not limited to, sharing non-public data via YieldStar/AI Revenue Management, secret meetings, surreptitious communications between Defendants by the use of telephone or in-person meetings at trade association meetings (and elsewhere) in order to prevent the existence of written records, limiting any explicit reference to competitor or supply restraint communications on documents, and concealing the existence and nature of their competitor supply restraint and price discussions from non-conspirators. The conspiracy was by its nature self-concealing.

96.    Throughout the Class Period set forth in this Complaint, Defendants and their co-conspirators effectively, affirmatively, and fraudulently concealed their unlawful combination and conspiracy from Plaintiff and Class members.

97.    The residential rental market is not exempt from antitrust regulation, and thus, before October 15, 2022, when ProPublica published the article "Rent Going Up? One Company's Algorithm Could Be Why," Plaintiff reasonably considered it to be a competitive industry. Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of Defendants' rental practices.

98.    Plaintiff exercised reasonable diligence. Plaintiff and the members of the Class could not have discovered the alleged conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to conceal their combination.

99.     By virtue of the fraudulent concealment of their wrongful conduct by Defendants and their co-conspirators, the running of any statute of limitations has been tolled and suspended with respect to any claims and rights of action that Plaintiff and the other Class members have as a result of the unlawful combination and conspiracy alleged in this Complaint.

## IX.    CLAIMS FOR RELIEF

### COUNT I

**Price Fixing in Violation of Section 1 of the Sherman Act (15 U.S.C. §1)**

100.    Plaintiff repeats the allegations set forth above as if fully set forth herein.

101.    Beginning at a time currently unknown to Plaintiff, but at least as early as January 1, 2016 (further investigation and discovery may reveal an earlier date), and continuing through the present, Defendants and their co-conspirators entered and engaged in a contract, combination, or conspiracy to unreasonably restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. §1).

102.    The contract, combination or conspiracy consisted of an agreement among the Defendants and their co-conspirators to fix, raise, stabilize, or maintain at artificially high levels the rents they charge for residential units in the Greater Boston Area and involved the exchange of competitively sensitive information between and among Defendants, causing anticompetitive effects without sufficient procompetitive justifications.

103.    Plaintiff and members of the Class have been injured and will continue to be injured in the form of overcharges on rent.

(a)     Defendants' anticompetitive conduct had the following effects, among others: Competition among Defendants has been restrained or eliminated with respect to residential rental units in the Greater Boston Metro Area;

(b)     The price of residential rental units in the Greater Boston Metro Area has

been fixed, stabilized or maintained at artificially high levels; and

(c)     Individuals have been deprived of free and open competition.

104.    This conduct is unlawful under the *per se* standard.  Defendants' conduct is also

unlawful under either a "quick look" or rule of reason analysis because the agreement is factually

anticompetitive with no valid procompetitive justifications.  Moreover, even if there were valid

procompetitive justifications, such justifications could have been reasonably achieved through

means less restrictive of competition.

105.    Plaintiff and members of the Class are entitled to treble damages, attorneys' fees,

and costs, and an injunction against Defendants to end the ongoing violations alleged herein.

## COUNT II

### Price Fixing in Violation of Section 4 of the Massachusetts Antitrust Act
### (Mass. Gen. Laws Ann. Ch. 93, §4)

106.    Plaintiff repeats the allegations set forth above as if fully set forth herein.

107.    Beginning at a time currently unknown to Plaintiff, but at least as early as January

1, 2016 (further investigation and discovery may reveal an earlier date), and continuing through

the present, Defendants and their co-conspirators entered and engaged in a contract, combination,

or conspiracy to unreasonably restraint of trade in violation of Section 4 of the Massachusetts

Antitrust Act (Mass. Gen. Laws Ann. Ch. 93, §4).

108.    The conspiracy among and between Defendants constitutes a *per se* violation of

Massachusetts Antitrust Act.  Alternatively, the unlawful conspiracy caused anticompetitive

effects that substantially outweigh any procompetitive justification, if any exist, in violation of the

rule of reason analysis under the Act.

109.    By preventing the competitive pricing of residential leases in Massachusetts, Defendants deprived Plaintiff and the Class the benefits of the competition that the Massachusetts Antitrust Act was designed to promote, preserve, and protect.

110.    As a direct and proximate cause of Defendants' unlawful conduct, Plaintiff and the Class have been required to pay inflated rental prices that would not have existed in the absence of illegal collusion.

111.    Plaintiff and members of the Class are entitled to treble damages, attorneys' fees, and costs, and an injunction against Defendants to end the ongoing violations alleged herein.

## COUNT III

### Unjust Enrichment

112.    Plaintiff repeats the allegations set forth above as if fully set forth herein.

113.    Defendants have been unjustly enriched at the expense of Plaintiff and the Class. Specifically, as described throughout, Defendants' anticompetitive conduct has caused Plaintiff and the Class to pay higher prices for residential rental units in the Greater Boston Metro Area than they would have in the absence of Defendants' illegal contract, combination, or conspiracy. And as a result, Plaintiff and the Class have suffered damages in the form of overcharges paid on their rental units.

114.    There was no valid justification for Defendants unjust enrichment.

115.    Defendants anticompetitive conduct has been to the detriment of Plaintiff and allowing Defendants to retain these benefits violates fundamental principles of justice, equity, and good conscience.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the Class of all others so similarly situated, respectfully request that:

A.     The Court determine that this action may be maintained as a class action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiff as Class Representative and her counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

B.     The Court adjudge and decree that the acts of Defendants are illegal and unlawful, including the agreement, contract, combination, or conspiracy, and acts done in furtherance thereof by Defendants and their co-conspirators be adjudged to have been a *per se* violation (or alternatively illegal under a quick look or full-fledged rule of reason violation) of Section 1 of the Sherman Act (15 U.S.C. §1);

C.     The Court permanently enjoin and restrain Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

D.     The Court enter judgment against Defendants, jointly and severally, and in favor of Plaintiff and members of the Class for treble the amount of damages sustained by Plaintiff and the Class as allowed by law, together with costs of the action, including reasonable attorneys' fees, pre- and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law; and

E.    The Court award Plaintiff and members of the Class such other and further relief as the case may require and the Court may deem just and proper under the circumstances.

### JURY TRIAL DEMANDED

Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated: December 29, 2022                    */s/ Anthony A. Orlandi*

BRANSTETTER, STRANCH & JENNINGS, PLLC
Anthony A. Orlandi
Tricia R. Herzfeld
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN, 37203
Telephone: (615) 254-8801
Facsimile: (615) 255-5419
aorlandi@bsjfirm.com
triciah@bsjfirm.com